BASIC CHEMICALS, INC., Appellee,

v.

Richard E. BENSON et al., Defendants, Benson and Berman appealing,

and

The Mellocraft Company, Added Appellant.

No. 57167.

Supreme Court of Iowa.

March 16, 1977.

Jerry E. Williams and R. Craig Shives, of Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, for appellants Berman Chemical Co. and The Mellocraft Co.

Terry F. Wright, Des Moines, for appellant Richard E. Benson.

H. M. Coggeshall and David J. W. Proctor, of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellee.

Heard before REYNOLDSON, Acting C. J., and MASON, LeGRAND, HARRIS and McCORMICK, JJ.

MASON, Justice.

This is an appeal by defendants Richard E. Benson, Berman Chemical Company and The Mellocraft Company from an adverse decree of the trial court entered in an equitable action brought against them by Basic Chemicals, Inc., on the theory defendants had appropriated and removed for their benefit trade secrets of plaintiff and had enticed its employees to join defendants and enter into unfair competition with plaintiff. Plaintiff's action against Curtis Noll Corporation, another defendant, was dismissed and there is no appeal from that portion of the trial court's decree.

Plaintiff, Basic Chemicals, Inc., a Des Moines firm, had alleged as a basis of its claim for relief that defendants conspired to (1) terminate Benson's employment relationship with plaintiff, (2) acquire and utilize plaintiff's customer list, cost books, buy books, production formulae and other confidential material, (3) entice other employees of plaintiff to sever relations with plaintiff and commence employment with defendant corporations, and (4) duplicate plaintiff's products and induce plaintiff's customers to purchase from defendants rather than plaintiff.

Plaintiff prayed for the return of all confidential material appropriated by defendants, injunctive relief, compensatory damages in the amount of $35,000 and punitive damages in the amount of $200,000. Plaintiff subsequently sought and obtained leave of court to amend the petition adding as a party defendant The Mellocraft Company, parent corporation of Berman Chemical Company and wholly owned subsidiary of Curtis Noll Corporation. In addition, plaintiff's prayer for compensatory damages was increased to $150,000.

Defendants denied plaintiff's allegations and the action was tried to the court in February of 1973. The trial court's findings of fact and conclusions of law were filed December 26, 1973, and a decree pursuant thereto was entered of record February 14, 1974. Based upon those findings and conclusions plaintiff was denied injunctive relief and punitive damages but was awarded compensatory damages in the sum of $109,756.03. Judgment was entered against defendants Benson, Berman Chemical Company and The Mellocraft Company, jointly and severally, but plaintiff's claim

for relief against Curtis Noll Corporation was dismissed pursuant to the court's determination there was "insufficient evidence to prove that Defendant Curtis Noll Corporation played an active role in the conspiracy."

Basic Chemicals, Inc., was organized in 1963 pursuant to a written agreement between defendant Richard E. Benson and Herman C. Behrendt. The prime objective of this agreement was the establishment of a chemical company to be engaged in the production and sale of chemicals for the wholesale market in the sanitary supply and contract cleaning industries. The agreement provided Benson would "devote his efforts entirely to the prime objective as well as afford time for other assignments so designated by Mr. Behrendt in connection with his other business enterprises," and specifically stated Benson was to "establish formulae, lowest costs, highest profits in keeping with competitive markets, sell and create necessary selling force, and otherwise be responsible for all details of this Corporation—Basic Chemicals Inc." Provisions for Benson's salary and expense account were also included therein.

Pursuant to their agreement, Benson, an individual with many years of experience in the production and sale of sanitary supplies, served as president and general manager of plaintiff until his resignation January 15, 1971. Behrendt provided the necessary financing for the enterprise and was chairman of plaintiff's board of directors.

Defendants Berman and Mellocraft are Ohio corporations. Mellocraft compounds, sells and distributes maintenance and sanitation supplies to retailers and contract cleaners. In addition to producing its own line of products, Mellocraft produces the items sold by Berman which has no production facilities of its own. As noted, Mellocraft is the sole stockholder of Berman and is itself wholly owned by Curtis Noll Corporation.

Plaintiff, like Mellocraft, compounds and sells maintenance and sanitation supplies, including protective floor coatings, disinfectants and detergents. Plaintiff, Mellocraft and Berman are all to some extent involved in what is referred to as the "private label chemical business," which simply means the purchaser's label rather than the Berman, Mellocraft or Basic label is affixed to the product.

Benson's resignation as president and general manager of plaintiff, effective January 15, 1971, was tendered a few days prior to that date. Plaintiff maintained and the trial court found that prior to January 1971 Benson had an understanding with Berman and Mellocraft whereby Benson would become an employee of defendant corporations immediately upon his resignation from plaintiff. Defendants however offered testimony in an attempt to demonstrate that, although employment discussions had occurred, no agreement was reached until the evening of Benson's resignation.

Behrendt testified that subsequent to his receipt of Benson's resignation but prior to the effective date thereof Basic's formula books, cost books, raw material source books and customer lists were discovered missing. When asked about the missing items Behrendt testified Benson said they were at his home and would be returned. According to Behrendt those items were never returned.

Lyle Middleton, successor to Benson and son-in-law of Behrendt, testified he discussed the missing items with Benson and was told that somehow Basic's buy books, formula books and some other items were inadvertently shipped to Ohio with some personal items belonging to Benson. Middleton stated he was told Benson would call his secretary and have her return them. Benson testified no such conversation occurred and pointed out he didn't even know he was going to Ohio until January 15, the day after the conversation allegedly took place.

Upon becoming president of Berman, and thus a salaried employee of Mellocraft, Benson immediately sent a letter, dated "January, 1971," to retailers and contract cleaners, including *customers of plaintiff*. That

letter, announcing his new position and address provided in part as follows:

"This advises of my resignation as President of Basic Chemicals Incorporated at Des Moines, Iowa. Many of you knew my secretary Millie Catlett—'my right arm that is'—she resigned as of December 1, 1970.

"I am now President of Berman Chemicals, headquarters at Toledo, Ohio. We wanted Millie with us but she could not move to Toledo at this time, for personal reasons. She did not care to remain at Basic pending my resignation.

" * * *

"Berman manufactures in a 4 story plant, with modern offices, laboratory and complete facilities at Toledo. We are properly financed, equipped and staffed. The Toledo location is ideal with superior trucking availability for prompt shipments. It offers better accessibility of containers, certain raw materials and services that were often remote to the Des Moines area of chemical manufacturing.

"This marks my 25th year of private label chemical manufacturing to our trade. Thanks to many of you, each of my 3 steps during these years has been up the ladder. * * *

"You know that I realize how important it is to private label customers that should you change source of supply, the product physical and performance constants remain identical to those purchased from me in the past. That is my personal guarantee to you in purchases from Berman. * * *

"Should you decide to place business with us at Berman, using your past catalogue, you can order as you have been. Berman product numbers are the reverse of the first 3 IBM NUMBERS of catalogues past. Products etc. will be identical along with your labels and other details—except for the phosphate replacement product.

" * * *

"We are prepared to ship about 98% of the product variety shipped you in the past years—prices are the same—service and attention to detail will be proven better. New catalogues, information sheets, product literature will be sent as soon as printed.

" * * *

"To celebrate my new affiliation and expanding of Berman Chemicals * * *.

" * * *

"The regular Representatives who have been with us the past years, have chosen to stay with us and represent Berman. * *

"My family and I plan to move to Toledo from Des Moines as soon as practical. * *

"Have known most of the executive people at my new affiliation for about 20 years. * * * They are all standing by to serve Berman Customers.

* * * * * *

"Sincerely,
Berman Chemicals Incorporated
/s/ Richard E. Benson"

Shortly after the above letter was mailed Benson sent out a Berman catalogue which plaintiff claims was for all practical purposes, a copy of plaintiff's catalogue. Plaintiff, in support of its contention, points to the following similarities: (1) although the correct corporate name of Berman is Berman Chemical Company, the cover of the Berman catalogue denominated Berman as "Berman Chemicals Incorporated," thus copying plaintiff's long-used corporate symbol "BCI"; (2) identical formats; (3) deceptively similar product names and descriptions; (4) identical product prices; (5) identical product order numbers except that Berman's catalogue added a hyphen thereto; and (6) both catalogues referred to Des Moines as the location of production and shipping facilities, although Berman's products were shipped from Toledo, Ohio.

Benson testified he incorrectly assumed the corporate name of Berman was "Berman Chemicals Incorporated" and attributed the mistake to carelessness. He pointed out his business card and Berman's mailing stickers contained the erroneous corporate title and that the letterhead on his

stationery contained the wrong address and zip code. In addition, he testified plaintiff's catalogue, compiled by Benson, copied the catalogue of his previous employer, which was likewise copied from the catalogue of a former employer.

Following Benson's departure plaintiff's sales and profits fell off markedly. Plaintiff's petition attributed its economic woes to the actions of defendants.

The trial court, basically adopting plaintiff's version of the disputed facts herein, concluded in part as follows:

"1. The circulation of * * * [the letter and catalogue] by Mellocraft, Berman and Benson acting in concert, in Iowa and to many of Basic's former customers, was well calculated to, and no doubt did mislead and cause confusion and/or misunderstanding as to the products in question. These two documents were intended to convince purchasers that the products of Berman were, in reality, those of Basic. The Court therefore holds that the circulation of these documents constituted and was palming off, or unfair competition. * * * [citing authorities].

"2. The formulae of Basic were of substantial value and gave Basic an advantage over competitors who did not have access to the same. The Court therefore holds that these formulae were trade secrets of Basic. * * * [citing authorities]. The Court further finds that their appropriation by Benson, as a result of his confidential relationship with Basic, and the unauthorized use of the same by Benson, Berman and Mellocraft created liability under the previous cited authorities.

"3. The compilations of information contained in Basic's cost books and buy books were of substantial value and gave Basic an advantage over competitors who did not have access to the same. * * * [same determination as in previous division].

"4. The information contained in Basic's customer list was of substantial value and gave Basic an advantage over competitors who did not have access to the same. * *

[same determination as in previous divisions].

"5. The Court finds that there is insufficient evidence in the record to justify a holding that the mailing list of Basic was a trade secret.

"6. The previously described acts of Berman, Mellocraft and Benson were committed pursuant to a conspiracy, some of the acts of which were committed in the State of Iowa by each party. However, the Court holds there is insufficient evidence to prove that defendant Curtis Noll Corporation played an active role in the conspiracy.

"7. * * *

"8. The Plaintiff has established with necessary certainty the amount of its damages. * * * [citing authorities]. The Court therefore holds that compensatory damages in the amount of $109,756.03 are to be awarded Basic, and assessed against Mellocraft, Berman and Benson and each of them.

"9. * * * The request of plaintiff for punitive damages will be denied."

The issues presented for this court's review herein are as follows:

(1) Are the formulae and other data compilations of concern herein trade secrets?

(2) Did the conduct of defendants constitute unfair competition?

(3) Does the evidence establish a conspiracy among and between the named defendants herein?

(4) Has plaintiff failed to establish with reasonable certainty the amount of damages sustained and the cause thereof? (Raised by defendant corporations only).

■■ In an equity matter, such as this, our review is de novo. Rule 334, Rules of Civil Procedure. It is our responsibility to review the whole record and determine from the credible evidence rights anew on those propositions properly presented, provided issue has been raised and error, if any, preserved in the course of trial proceedings. While weight will be given to findings of the trial court, this court will not abdicate its function as triers de novo

on appeal. *Hansen v. Chapin*, 232 N.W.2d 506, 509 (Iowa 1975).

■ Where, as here, the credibility of witnesses is a consideration in an equity case we give weight to the fact findings of the trial court although we are not bound by them. Rule 344(f)(7), R.C.P. *In re Marriage of Bare*, 203 N.W.2d 551, 554–555 (Iowa 1973).

■ I. The generally recognized prerequisites for a claim for relief based upon the appropriation of a trade secret are (1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret. *E. W. Bliss Company v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1112 (8 Cir. 1969); *Venn v. Goedert*, 319 F.2d 812, 815 (8 Cir. 1963); *Wheelabrator Corporation v. Fogle*, 317 F.Supp. 633, 637 (W.D.La.1970); *GTI Corporation v. Calhoon*, 309 F.Supp. 762, 767 (S.D.Ohio E.D. 1969). The burden is upon plaintiff to establish each of these elements by a preponderance of the evidence. *Venn v. Goedert*, 319 F.2d at 815; *GTI Corporation v. Calhoon*, 309 F.Supp. at 767; *Van Prod. Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 775, 30 A.L.R.3d 612.

Restatement, Torts, section 757, comment b, pp. 5–6, provides in part as follows:

"b. *Definition of trade secret.* A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, * * *.

"*Secrecy.* The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. * * * It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

The provisions of the Restatement appear to be the appropriate starting point for the resolution of a trade secret controversy. *A. H. Emery Company v. Marcan Products Corporation*, 389 F.2d 11, 16 (2 Cir. 1968), cert. den., 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106; *Forest Laboratories, Inc. v. Pillsbury Company*, 452 F.2d 621, 623–624 (7 Cir. 1971); *Hulsenbusch v. Davidson Rubber Company*, 344 F.2d 730, 734 (8 Cir. 1965), cert. den., 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468; *Clark v. Bunker*, 453 F.2d 1006, 1009–1010 (9 Cir. 1972); *Henkle & Joyce Hardware Co. v. Maco, Inc.*, 195 Neb. 565, 239 N.W.2d 772, 775–776; *Van Prod.*

*Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d at 775.

Defendants contend the items allegedly appropriated by them were not trade secrets but were simply the products of defendant Benson's experience, knowledge and skill in this particular field. Emphasizing the absence of a restrictive covenant between Benson and plaintiff, defendants direct this court's attention to the following from *Van Prod. Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d at 776:

" * * * One rather salient point runs steadfastly throughout decisions in this area in most jurisdictions, and that is that the employee, upon terminating his employment relationship with his employer, is entitled to take with him 'the experience, knowledge, memory, and skill, which he had gained while there employed. * * * A man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer. Williston on Contracts, § 1646, p. 4627.' [14 Williston on Contracts, Third Ed., section 1645] * * * [citing authority]." See also *Baker v. Starkey*, 259 Iowa 480, 493–494, 144 N.W.2d 889, 896–897.

Plaintiff, on the other hand, points out it does not contend Benson was prohibited from using his mental ability, general knowledge, skills and experience after he left the employ of Basic but insists Benson was not at liberty, pursuant to a conspiracy with Berman and Mellocraft, to purloin valuable and confidential documents of Basic which it contends were trade secrets and make wrongful and unauthorized use of the same to Basic's prejudice. It is the wrongful appropriation and use of Basic's trade secrets that it complains of, not Benson's acumen or worldly wisdom.

During the years Benson was an employee of plaintiff certain compilations of information including chemical formulas, customer books, "buy books" and "cost books" were developed.

In determining whether the documents involved were in fact trade secrets as plaintiff contends it would be helpful to have some description of the contents and use of these documents and the manner in which they were developed as shown by the record.

When Basic first entered the sanitary supply industry, most of the products it sold were purchased from other companies for resale, for Basic had not developed its own product line. However, over the years Basic was able to develop many formulas enabling it to compound or manufacture its own detergents and protective floor coatings.

Basic's mode of business was first to determine a type of product it wished to develop. It would then often ask suppliers of raw materials to suggest formulas for such a product. However, very rarely, if ever, would a suggested formula produce a product that Basic desired to market. Mr. Behrendt testified:

"It's a rare instance when a suggested formula is what you are looking for but you have a starting point and from that place on by varying the kinds of materials put in by varying the amounts, by varying the sequence that the materials go in, sometimes in two weeks, sometimes two years you come up with the product you think you want to put your name on and go sell."

These formulas provided by raw material suppliers were really intended to only be a starting point for the manufacturer. Almost in every case each supplier furnishing Basic with a formula specifically warrants nothing in regard to the worth or value of the product it would produce.

In order for Basic to finally develop a product formula, significant research, laboratory testing and other experimentation were necessary.

The formulas that enabled the production of Basic's products were contained in formula books, plaintiff's exhibits 23 and 24.

During the period from 1963 to 1971 Basic also developed and maintained as an essential part of its business "buy books" (plaintiff's exhibits 8 and 9) and "cost books" (plaintiff's exhibit 10).

At trial Mr. Behrendt explained the content and use of the "buy books":

"It's the name of the material, the name of the supplier. When I say 'buy' the book usually states by so and so. Buy number 621 we will say, for an example, resin or whatever item it happens to be, this is set up by item. In this same buy book you may have pages for one company, there would be a separate page for each product that you bought from this company. The book is not set up by companies. There would also be the price of the product; there would be a shipping point, whether you sent the order to the same point that it was shipped from; there would be the price; there would be the information, whether it's prepaid to destination or FOB shipping point; the salesman's name, if this was important, or the person's name in the company that correspondence should be addressed to; any information that was pertinent to the purchase of this particular chemical."

He also explained the purpose of the "cost books":

"This book is made up from the other sources that we talked about previously such as the buy book. For instance, we have product and the name of the product is given. Then there will be a raw material cost entered. The raw material cost is computed from the ingredients that are in the formula, and the cost of these ingredients come from the buy book. Then after the raw material cost is entered, there will be a commission entered. To arrive at the total cost then there will be a container entered with the cost of the container entered so you have your total cost. By using this then and subtracting from it the selling price you arrive at your gross profit and also you can compute your gross percentage from that."

During the period Benson was an employee of Basic, the company also accumulated personal data concerning its customers and entered this information into customer books. These customer books contained such things as the proper time to call on specific customers; the names of key employees of customers; the names of spouses and children of individual customers as well as their birthdays, together with particular likes and dislikes of specific customers. In short, Basic entered into its customer books any information it learned that would be useful in developing and maintaining a successful relationship with a customer.

Mr. Behrendt described the distinction between a customer list and a mailing list in this fashion: "A customer list would be a list of people who are purchasing material from you, and a mailing list would be a list that contained the name of the customers as well as prospects for your merchandise."

A review of the record discloses in some detail the effort Basic went to to restrict access to its formula books and to keep their contents secret. Many of the procedures employed in this connection were originated by Benson while an employee of Basic. There were only three sets of Basic's formula books in existence at any one time. One set was entrusted to Benson; one set was always kept in a safe to insure the continued availability of formulas in the event of a disaster, such as fire; the third set was removed from Basic's safe each working day for use in manufacturing products and was returned to the safe each evening.

There is evidence employees were instructed that the formulas used in Basic's "shop" during the manufacturing of products were to remain in the shop until returned to the safe at the close of the working day. Employees were also instructed that whenever a salesman or customer toured the plant the formulas were to be removed from sight. Should any unauthorized person in the shop area attempt to read the formulas the employees were to report the same to the office immediately.

Behrendt testified Basic had a policy of treating its "buy books" and "cost books" as

confidential and would not release the information contained therein to a customer or competitor. Basic had a policy of maintaining the information in the customer books secret. There was only one set and Benson was the only person given unlimited access to those books.

The record before us justifies a finding that plaintiff expended substantial time, thought and money in research, laboratory testing and experimentation in creating and perfecting the chemical formulas and processes recorded in its formula books which enabled the production of its products. Substantial effort would be required to assemble the detailed elements of the formulas from publicly available sources. This is also true of plaintiff's "buy books" which contain a compilation of raw materials, suppliers, prices and shipping points. It is evident considerable time and thought went in to the collection of the material for the "cost books" from which the total product cost and the method of determining the profit could be ascertained. The manner in which the material in the customer books was compiled was described in Mr. Behrendt's testimony set out earlier.

As we understand, it is plaintiff's position it was the formula books combined with the "buy books" and the "cost books" which enabled Basic to produce detergents and protective floor coatings and sell them profitably. These compilations of information were used extensively by Basic in its business and gave it an advantage over competitors who did not have access to the same.

We conclude from our de novo review Benson wrongfully appropriated the formula books, the "buy books," the "cost books" and customer books for use by himself and the corporate defendants. The issue at this point is whether these compilations are trade secrets.

An essential element of a claim for relief for appropriation of a trade secret is existence of a trade secret. *E. W. Bliss Company v. Struthers-Dunn, Inc.*, 408 F.2d at 1112. The following statement from *Clark v. Bunker,* 453 F.2d at 1009–1010, is relevant:

" 'The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.' * * * [Restatement, Torts, section 757, comment b] at 5–6. However, the interest protected by this branch of the law is not secrecy as such. 'The protection is merely against breach of faith and reprehensible means of learning another's secret.' *Id.* at 7. Accordingly, 'a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.' *Id.* at 6.

"Whether such a degree of secrecy existed in a particular case is a question of fact. It is not negated because defendant by an expenditure of effort might have collected the same information from sources available to the public. Obviously it may be present despite the publication of general descriptions in advertisements, sales brochures, and similar material; or by sales where the details are not readily apparent from inspection of what is sold, or the purchasers do not disclose those details."

The Court in *Kewanee Oil Company v. Bicron Corporation,* 416 U.S. 470, 475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315, announced that:

" * * * This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another 'in confidence, and under an implied obligation not to use or disclose it.' * * * [citing authorities]. These others may include those of the holder's 'employees to whom it is necessary to confide it, in order to apply it to the uses for which it is intended.' "

█ In our view the fact Benson while in Basic's employ developed the processes of compounding and blending raw materials utilized by Basic in marketing its products does not affect the secretiveness of the information compiled in the books involved.

Defendants' contention Benson was entitled to take with him the skills learned and the knowledge acquired during his employ-

ment with Basic since the formulas utilized and the information contained in the "buy books," "cost books" and customer books were the result of Benson's efforts is well answered by this pronouncement in *Sperry Rand Corporation v. Rothlein,* 241 F.Supp. 549, 564–565 (D.Conn.1964):

"The fact that it was the defendants who developed the process gives them no greater right to use it in competition with the plaintiff than that of any other employee.

" * * *

" 'The law is well settled that knowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of the employer during the employment; and after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer.' * * * [citing authorities]."

Defendants' contention in this respect is without merit. For other decisions in which the pronouncement made in *Sperry Rand Corporation* is recognized see *Tlapek v. Chevron Oil Company,* 407 F.2d 1129, 1134 (8 Cir. 1969); *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp.,* 255 F.Supp. 645, 653 (E.D.Mich.S.D.1966); *Standard Brands, Inc. v. Zumpe,* 264 F.Supp. 254, 262 (E.D.La.1967); *Raybestos-Manhattan, Inc. v. Rowland,* 310 F.Supp. 993, 994–995 (D.S.C.1969).

There is evidence of letters written by Benson to salesmen and customers during his employment by Basic in which he recognized that the various formulas involved were secret and confidential. Benson's deposition exhibit 3; plaintiff's exhibits 25, 26, 30, 34, 35 and 38. In these letters Benson praised the "know-how" of Basic.

The six factors to be considered in determining whether given information is one's trade secret have been set out earlier in the quotation from Restatement, Torts, section 757, comment b. When we view the evidence in light of those factors we con-

clude plaintiff met these criteria by a preponderance of the evidence and is entitled to the protection afforded by the trade secret doctrine in regard to the formula books, "buy books," "cost books" and customer books.

In reaching this conclusion we have not overlooked the facts that prior to joining Basic, Benson had been in the private label business as a salesman for some years, and with several different companies; in the course of such prior employment he had become acquainted with many wholesalers and contractors; and he had accumulated a customer prospect list before coming with Basic.

Defendant's argument advanced in reply brief that "the record provides no proof that any product compounded by Mellocraft and sold by Berman was manufactured with a formula used by Basic" does not persuade us to hold otherwise in view of Benson's letter to "Dear Customers" dated January 1971 (no day) where he said the product physical and performance constants would remain identical to those purchased from him in the past—that is while he was employed by Basic. At another point he said the products would be identical.

II. Having determined that plaintiff's books involved in this lawsuit were plaintiff's trade secrets and that they had been misappropriated by Benson for use by himself and the corporate defendants, we turn to defendants' attack on the trial court's conclusion that defendants engaged in unfair competition with respect to plaintiff. This conclusion was based on the circulation of the January 1971 letter, pertinent portions of which have been set out earlier, and a catalogue which occurred shortly after Benson joined the Berman-Mellocraft organization. The court also concluded defendants' actions were "calculated to and no doubt did mislead and cause confusion and/or misunderstanding as to the products in question," and constituted "palming off, or unfair competition."

The letter referred to in the court's decree is identified in the record as Benson's

deposition exhibit 14, the catalogue as Benson's deposition exhibit 21.

Basic printed and distributed to the trade its first catalogue in 1963. As new products were developed by Basic and as prices changed, new catalogues would be printed and circulated. From 1963 to 1969 five catalogues were printed and distributed. In excess of 2000 copies of the 1969 catalogue were distributed to actual and potential customers. In December 1970 Benson printed and circulated the catalogue which is material to this lawsuit. It is identified in the record as Benson's deposition exhibit 20. Predominantly displayed on the front of each of these catalogues was "BCI" which was the logogram of Basic.

In support of the trial court's decree plaintiff argues defendants' circulation of the letter identified as exhibit 14 to customers of Basic and to the members of the sanitary supply industry guaranteeing in effect that purchasers could buy products identical to Basic's from Berman through the use of Basic's catalogue and through the use of Berman product numbers, which were the reverse of Basic's, together with circulation of Berman's catalogue, constituted an express or implied representation that Berman products were in reality Basic's.

Plaintiff contends "this case is concerned with a scheme first permitting Basic customers to purchase products simulative of Basic products by using Basic catalogues and Basic product numbers, and later with a scheme virtually adopting the entire Basic catalogue including format, logogram, product names, product descriptions, product prices, and even page numbers, together with a false representation that the place or origin of Berman products was Des Moines, Iowa."

Defendants in attacking the decree maintain there was no representation that the goods advertised or sold by defendants were those of a competitor.

■ The doctrine of unfair competition is based on the principle of common business integrity. It goes to the question of a defendant's methods and representations in marketing his products, not to his right to manufacture or produce them. *B. H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1263 (5 Cir. 1971).

In *Johnson Gas Co. v. Reliable Gas Co.,* 233 Iowa 641, 646–647, 10 N.W.2d 23, 27, this court stated:

"There are many cases involving unfair competition decided by the state and federal courts. Many of them are collected in the Annotation in 84 A.L.R. 472 to 490. * * * [T]he writer of the A.L.R. annotation, above cited, states the general rule, at page 484, that:

" 'The essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another, and while this involves an intent to deceive, it is not necessary to prove intent by direct evidence, where it is clearly to be inferred from circumstances.'

"The previous decisions of this court follow the above general rule. We said in the case of *Motor Accessories Mfg. Co. v. Marshalltown Motor Material Mfg. Co.,* 167 Iowa 202, 207, 149 N.W. 184, 186, that unfair competition:

" ' * * * consists in the conduct of a trade or business in such a manner that there is an expressed or implied representation that the goods or business of the one man are the goods and business of another. * * * The ground of the action of unfair competition is fraud, and this may be shown by direct testimony, or by facts and circumstances or inferred from the manner in which the business is carried on.' " See also *B. H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d at 1262; *Volkswagenwerk Aktiengesellschaft v. Rickard,* 492 F.2d 474, 478 (5 Cir. 1974); *F. W. Fitch Co. v. Camille, Inc.,* 106 F.2d 635, 639 (8 Cir. 1939).

■ Contrary to defendants' contention, a demonstration of actual confusion in the minds of the consumers is not a prerequisite for plaintiff's successful assertion of an unfair competition claim. All that is required is a showing of a likelihood or probability of confusion as a natural consequence of the

activities. *Surgical Supply Service, Inc. v. Adler,* 321 F.2d 536, 539 (3 Cir. 1963); *Professional Golfers Ass'n v. Bankers L. & C. Co.,* 514 F.2d 665, 671 (5 Cir. 1975); *Alberto-Culver Company v. Andrea Dumon, Inc.,* 466 F.2d 705, 708–709 (7 Cir. 1972).

■ The question is whether the natural consequence of defendants' activities would create probable confusion in the minds of customers in the sanitary supply industry as to the products in question. A solution of this issue requires some repetition.

Benson's employment with Basic was terminated January 15. His letter of January 1971 was composed and circulated shortly after his association with Berman. Berman's first catalogue was circulated about February 15. It was to become effective the following May. Benson advised potential customers that in the meantime they could use Basic's 1970 catalogue and by following the suggestions contained in his letter obtain products which would be identical in physical and performance constants to those they had purchased from him while he was employed by Basic. Prices would remain the same.

As stated, plaintiff asserts there are at least six similarities between Basic's 1970 catalogue, exhibit 20, and Berman's catalogue, exhibit 21. A side-by-side comparison of the two catalogues compels the view that for all practical purposes Berman's catalogue is a copy of plaintiff's catalogue. In its 1970 catalogue plaintiff listed, described and priced 100 items. Berman listed, described and priced 97 items.

Commencing in 1963 plaintiff conducted a campaign to familiarize customers in the trade with its products by distributing six catalogues describing the uses and purposes of its products and their trade names. Plaintiff's efforts to acquaint actual and potential customers with its products must have been successful in view of the continued employment of the same format in its advertising.

It is in the totality of the foregoing circumstances defendants seek to compete with plaintiff by asserting their products would be identical to those of Basic.

Defendants in response to plaintiff's contentions insist there was no effort to defraud the trade, pointing to Benson's January 1971 letter in which he discredited any contention of an intent to deceive by advising customers that he was now president of Berman Chemicals with headquarters in Toledo, Ohio, and by describing the company's facilities. Although this is a fact to be considered by us in reaching our determination we are not convinced it constitutes a defense to plaintiff's claim. A fact question still exists.

Evidence of defendants' use of Basic's 1970 catalogue in marketing Berman's products was probative of their intent to deceive customers as to the source of products ordered from Berman and of defendants' intent to engage in unfair competition. See in support *B. H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d at 1262–1267.

From our de novo review we conclude there is a preponderance of evidence which warrants this court in finding defendants' activities were calculated to convince customers defendants were offering identical products to those offered by Basic and at the same prices. In our opinion the natural consequence of defendants' activities was to cause confusion and misunderstanding as to the products in question and that this constituted a "palming off or unfair competition."

III. Defendants assert the trial court erred in finding that certain acts of Berman, Mellocraft and Benson were committed pursuant to a conspiracy.

■ A conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful. It may be proven by substantial evidence. See *Stover v. Hindman,* 159 N.W.2d 422, 424 (Iowa 1968), and authorities cited therein. It is a recognized aspect of Iowa substantive law. *State of Iowa ex rel. Turner v. First of Omaha S. C.,* 401 F.Supp. 439, 443 (S.D.Iowa 1975).

The principal element of conspiracy is an agreement or understanding between two or more persons to effect a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury. *Neff v. World Publishing Company,* 349 F.2d 235, 257 (8 Cir. 1965). Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy which give rise to the action. *Shannon v. Gaar,* 233 Iowa 38, 44, 6 N.W.2d 304, 308.

Our review is de novo. We conclude the acts complained of were performed pursuant to a conspiracy among defendants Benson, Berman and Mellocraft.

IV. The corporate defendants assert plaintiff failed to establish its damages with reasonable certainty. As stated, the trial court awarded plaintiff compensatory damages in the amount of $109,756.03.

Mere difficulty in ascertaining damages does not alone constitute a cause for denial of recovery. *Holden v. Construction Machinery Company,* 202 N.W.2d 348, 364 (Iowa 1972). This statement of principle from *Patterson v. Patterson,* 189 N.W.2d 601, 605 (Iowa 1971), was repeated with apparent approval in *Northrup v. Miles Homes, Inc. of Iowa,* 204 N.W.2d 850, 857 (Iowa 1973):

"Courts have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. If it is speculative and uncertain whether damages have been sustained, recovery is denied. If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated."

In reaching its conclusion that plaintiff had established with necessary certainty the amount of its damages the trial court relied on *DeVries v. Starr,* 393 F.2d 9, 20 (8 Cir. 1968), where the court stated:

"* * * [I]t appears to be recognized that proof of a plaintiff's actual experience in the way of volume of business, and especially in the way of net profits, during a reasonable interval immediately preceding the impact of an actionable wrong of the sort here involved, is competent and instructive evidence, and is entitled to consideration, upon the subject of damages consequent upon such wrong. It provides a basis whereon, whether partially or exclusively, the trier of the facts may estimate and find such damages, for it points to the value of the enterprise against which a wrong is alleged."

The trial court also cited *Benshoot v. Reese,* 250 Iowa 868, 97 N.W.2d 297; *DeWaay v. Muhr,* 160 N.W.2d 454 (Iowa 1968); *Falstaff Brewing Corp. v. Iowa Fruit & Produce Co.,* 112 F.2d 101 (8 Cir. 1940); and *Williams v. Northern Natural Gas Co.,* 136 F.Supp. 514 (N.D.Iowa 1955), in its decree in support of its conclusion. We have read the cited cases and agree.

The trial court in its decree went to some length in detailing the process it had employed in arriving at the award of damages. The trial court's efforts in this respect have been helpful to this court.

As a result of our study we conclude there was proof of a reasonable basis from which the amount of damages can be inferred or approximated. We are not disposed to interfere with the amount of the award.

In reaching our conclusion as to the issues presented we have considered every contention and argument urged by defendants whether specifically referred to or not in this opinion and find none which require reversal.

The case is therefore—Affirmed.