**SOUTHERN NEW YORK RAILWAY, INC., et al., Appellants,**

v.

**FORT DODGE, DES MOINES & SOUTHERN RAILWAY COMPANY, et al., Appellees.**

No. 65210.

Supreme Court of Iowa.

March 17, 1982.

D. M. Statton, Bethesda, Md., Mahoney, Jordan, Mahoney & Donelson, P.C., Boone, and Donald H. Latzer, Kalona, for appellants.

Frank W. Davis, Jr., of Gamble, Riepe, Burt, Webster & Davis, Des Moines, for railroad appellees.

Glenn L. Smith of Duncan, Jones, Riley & Finley, Des Moines, for trustee appellee.

Considered by LeGRAND, P. J., and McCORMICK, ALLBEE, McGIVERIN, and LARSON, JJ.

ALLBEE, Justice.

This is an appeal by plaintiff bondholders from a decree denying their demand that trial court declare a default of the mortgage securing their bonds, rule the bonds immediately due, remove the trustee under the mortgage and appoint a successor trustee to protect and enforce their rights as bondholders, order a foreclosure and sale of the assets of the railroad whose property and operations secure the bonds, impress a trust upon the profits of the railroad's operations, and order an immediate accounting.

The action underlying this appeal was brought and tried in equity, thus our review is de novo. Iowa R.App.P. 4. In equity cases we accord weight to the fact findings

of the trial court, especially when considering the credibility of the witnesses whom that court heard and observed firsthand, but we are not bound by those findings. Iowa R.App.P. 14(f)(7).

Our examination of the extensive record presented here persuades us that trial court's decree should be affirmed. In order to convey an understanding of our conclusion regarding trial court's decree, we will sketch the historical and factual background of this protracted litigation, recount a portion of the pertinent evidence, and explain our determination of those issues central to the resolution of this appeal.

## I

In 1941, as a result of reorganization in bankruptcy of defendant Fort Dodge, Des Moines & Southern Railway Company (FDM), an Indenture of Mortgage and Deed of Trust, bearing the date January 1, 1941, but not actually executed and delivered until April 14, 1943, was entered into by the reorganized FDM, as mortgagor, and defendant Iowa-Des Moines National Bank, as trustee. The indenture authorized the issuance of $2,260,000 of series "B" bonds constituting a first lien on essentially all of the assets owned by FDM. The series "B" bonds are income bonds, with an obligation to pay four percent interest per annum provided that the "available net income" for each income period, as calculated pursuant to the terms of the indenture, is sufficient to pay interest. Under the indenture, all such series "B" bonds issued are to mature on December 31, 1991.

At the time of trial, the principal amount of the series "B" bonds in the hands of the public stood at $610,000. Of this sum, plaintiffs are the holders of bonds with an aggregate face value of $348,360.

Ownership of FDM has changed since the execution of the indenture. In 1955, defendant Des Moines and Central Iowa Railway Company (DMCI) purchased in excess of eighty percent of the outstanding stock of FDM. Thereafter, the principal officers and directors of both railroad corporations were Morris H. Snerson and Murray M. Salzberg. We note this because those individuals were also the principal officers of the corporate plaintiff bondholders in this case. In addition, the individual plaintiff bondholders here are relatives of either Snerson or Salzberg or formerly were employees or officers of FDM.[1]

In 1966, Snerson and Salzberg and their associates agreed to sell their stock holdings to defendant Chicago and North Western Railway Company (C&NW).[2] That stock transaction was closed on July 29, 1968, with approval of the Interstate Commerce Commission. The transaction constituted a takeover of both the FDM and DMCI railroads by C&NW. The plaintiffs were owners of the bonds in question at the time this stock transaction took place as well as at the time of trial.

On June 21, 1971, a lease between FDM and C&NW, approved by the Interstate Commerce Commission, became effective. By this lease, FDM, in short, became a leased railroad of C&NW. The lease is for

1. The plaintiffs and their series "B" bond holdings are as follows: Southern New York Railway, Inc.—$30,000; West Vaughn Realty Corporation—$97,660; H. E. Salzberg Co., Inc.—$96,200; Sarah Bussey—$30,000; Hedie Salzberg—$9,100; Dana Salzberg—$11,900; Harry Salzberg—$11,800; Beth Rostau—$60,500; and W. A. Curran and Mary E. Curran—$1,200.

2. On June 1, 1972, substantially all of the assets and liabilities of Chicago and North Western Railway Company were transferred to defendant Chicago and North Western Transportation Company. For convenience, we will use the acronym C&NW to identify both companies. C&NW will signify the former company

regarding events prior to June 1, 1972, and the latter company with respect to events after that date.

Two additional defendants also need to be identified. Defendant Northwest Industries, Inc., acquired and held control of C&NW from April 4, 1968, to June 1, 1972. Since the latter date, it has had no corporate relationship with either of the corporations herein designated as C&NW. Defendant Northwest Chemco, Inc., on June 21, 1972, became the corporate successor of Chicago and North Western Railway Company, after the transfer of assets and liabilities of that latter corporation to Chicago and North Western Transportation Company.

a term of fifty years "unless sooner terminated, as it may be at any time on thirty (30) days' written notice by either party." It provides for an annual payment to FDM of $60,000 per year in addition to C&NW's assumption of certain obligations which otherwise would fall upon FDM.

During the years that Snerson and Salzberg and their associates controlled FDM, 1955 to 1968, four percent interest on the series "B" bonds was paid in 1958, two and one-half percent interest was paid in 1959, and one-half percent in 1960. After C&NW took control of FDM in 1968, four percent interest was paid on the bonds each year from 1975 to the time of trial in 1979.

Additional background will be related as necessary for treatment of the issues raised on this appeal.

## II

This action was commenced on December 10, 1973, and tried during June 1979; briefs were subsequently submitted by the parties, and trial court's decree was filed May 2, 1980.

Plaintiffs' petition essentially alleges a conspiracy among defendants to defraud plaintiff bondholders of their security for the bonds they hold. At trial, plaintiffs' amended their petition to allege negligence and bad faith by defendant trustee. A summary of the relief sought by plaintiffs was set out in the opening paragraph of this opinion.

In its decree, trial court dismissed plaintiffs' petition as to all defendants except FDM and C&NW. As to those two defendants, trial court likewise dismissed plaintiffs' claims against them but retained jurisdiction over both as to any subsequent attempt by either "to cancel, change or in any manner alter said lease [of June 21, 1971]." We note that the virtual effect of this retention of jurisdiction, to which both defendants have acceded, is to render that lease non-cancellable.

## III

In this appeal, plaintiffs rely on nine intertwined propositions for reversal. Those propositions, however, may be compacted and rearranged into three pivotal issues: (1) whether, as alleged, a conspiracy existed among certain defendants to defraud plaintiffs of their security for the series "B" bonds they hold; (2) whether an event of default, as provided and defined in the indenture, occurred such as would cause the bonds to become due and payable; and (3) whether defendant trustee acted negligently or in bad faith in the performance of its duties.

Although we shall confine our opinion to the foregoing issues, we have nonetheless considered each of plaintiffs' propositions as urged in their brief. Suffice it to say that we conclude there is no merit in any of plaintiffs' assertions; to recite and write on each would add only length to this opinion and nothing to our body of law.

## IV

■ Plaintiffs' petition alleges a conspiracy among defendants, including the trustee, to defraud plaintiffs of their security as series "B" bondholders. Their brief on this appeal, however, narrows the purported conspiracy. The brief describes the conspiracy as a plan of C&NW directors to abandon the FDM line, once acquired, sell off its assets and take over its freight business, all to the detriment of plaintiffs' security. For evidence in support of their assertion, plaintiffs point to the sale of FDM assets including locomotives, rolling stock, equipment, facilities, rails and ties. Plaintiffs similarly argue that the sale of sizeable real estate holdings of FDM also supports their conspiracy claim.[3] They further contend that the alleged abandonment of certain of FDM's tracks and services likewise evidences a conspiracy to emasculate FDM as a viable railway system and destroy plaintiffs' security as bondholders.

**3.** The sales of such assets will receive further scrutiny in connection with the issue of wheth-er an event of default occurred. *See* Division V, *infra*.

The definition of a civil conspiracy, its elements, and the quantum of evidence required to prove a conspiracy were most recently delineated in *Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220, 232–33 (Iowa 1977), and need not be repeated here. In *Basic Chemicals*, we are reminded that unless actual damage has resulted from something done by one or more of the conspirators in furtherance of the object of the conspiracy, no civil action lies against anyone. *Id.* at 233; *see Neff v. World Publishing Co.*, 349 F.2d 235, 257 (8th Cir. 1965).

Like trial court, we conclude that plaintiffs failed to sustain their burden of proving, by substantial evidence, any such conspiracy. There is no evidence that C&NW directors, or any combination of defendants, entered into any concerted action to accomplish an unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful; there is no evidence that any allegedly conspiratorial act resulted in injury to plaintiffs, or that plaintiffs have sustained damages as a result of such acts allegedly done by any defendant. Nor does the evidence support the charge that the bondholders' security has been impaired.

On the contrary, trial court found that subsequent to the advent of C&NW control, and particularly since the lease between the two railroads was entered into, the "financial affairs of the FDM have been managed in a prudent, reasonable, and proper manner." We believe this finding is justified. Trial court observed, as do we, that in contrast with the long history of nonpayment of interest on the bonds prior to 1974, interest has been regularly paid since then. We also take note of the testimony of Morris H. Snerson, who acknowledged that the assets of FDM are sufficient security for the mortgage.

## V

■ The sales of various assets of FDM covered by the lien of the mortgage, allegedly without replacement, are asserted by plaintiffs to constitute a default of the indenture. In this connection, we first observe that events of default are enumerated and defined in Article XI, Section 1, of the indenture. The indenture specifies such events as (a) default in payment of interest on bonds when and if under terms of the indenture interest shall become due and payable, (b) default in payment of principal of bonds when and if under terms of the indenture principal shall become payable, (c) default in the maintenance of working capital or certain reserves, (d) default as the consequence of action instigated by others resulting in reorganization under bankruptcy laws or the appointment of a trustee or receiver for the property of FDM, and (e) default from action of FDM in consenting to a receiver, or seeking reorganization, or taking other steps to secure advantage of any act in aid of debtors. Thus it can be seen that the sales by FDM of assets covered by the mortgage do not per se constitute events of default as that term is defined in the indenture. Moreover, there is no evidence which would support a finding that any specified event of default has occurred here.

Notwithstanding the absence of an event of default, we next look to whether the property sales complained of were made in violation of other terms of the indenture, as claimed by plaintiffs, and were such as to rise to the level of a default. Plaintiffs insist that Article XIII, Section 2, of the indenture was breached by the "sell-off of all of FDM's rolling stock without replacement." That provision, which deals with the disposal of rolling stock and other personal property items, states:

The Railway Company from time to time while in possession of the mortgaged property and not in default hereunder shall also have full power in its discretion without reference to the Trustee to dispose of, free from the lien hereof, any of the rails, ties, rolling stock, machinery, tools and implements at any time subject to the lien hereof which may have become unsuitable or unnecessary for the use of the Railway Company, provided that the same are then replaced by new property of like character and use or adapted to rendering equivalent service and of at

least equal value which shall have become subject to this mortgage.

It is immediately apparent that this provision grants discretion to FDM for the sale of unsuitable and unnecessary personal property, free of the mortgage lien, without consulting the trustee. Plaintiffs' complaint that no release was sought or given by the trustee for the sale of personalty, therefore, is unavailing. It follows that the trustee cannot be implicated on this ground.

Nor do we find a violation of the indenture provision in question by the railroad defendants. While it is not disputed that property which was sold was subject to the lien of the mortgage, there is also no serious dispute that this property was in fact unsuitable or unnecessary for FDM operations. For example, the record reflects that the FDM locomotives were too small and in poor condition. The freight cars sold were among the oldest such cars still used in railway interchange service; furthermore, the cars were obsolete, difficult to service and unsuitable for operations. Under this provision of the indenture, FDM was to replace the personalty which was sold with new property *either* of like character and use *or* adapted to rendering equivalent service of at least equal value. We view the lease of the FDM line to C&NW as constituting replacement property. *See, e.g., Johnson v. Nelson*, 275 N.W.2d 427, 430 (Iowa 1979) (property is a term of broad meaning and "includes everything of value, tangible or intangible, capable of being the subject of individual right or ownership."). *See generally* 1 G. Thompson, *Commentaries on the Modern Law of Real Property* § 5 (1980). As such, we believe that by means of the lease equivalent service was rendered of at least equal value. We deem this a practical construction of the indenture provision in light of the circumstances presented here. *See Lovlie v. Plumb*, 250 N.W.2d 56, 59 (Iowa 1977). The purpose for this provision of the indenture is to protect the security of the bondholders, and that object has been met in this instance by means of the lease. The lease is now, of course, property subject to the mortgage.

■ The sales of real property owned by FDM and subject to the mortgage lien are also asserted by plaintiffs to have constituted a default under the indenture. We disagree. Article XIII, Section 1, of the indenture provides:

Upon the written request of the President or a Vice-President of the Railway Company, approved by resolution of its board of directors, from time to time while the Railway Company shall be in possession thereof and not known to the Trustee to be in default hereunder, the Trustee shall release from the lien and operation of this mortgage any part of the trust estate, provided that (1) the ownership thereof shall no longer be necessary or advantageous in the operation of or in connection with the business of the Railway Company; (2) the continuity of the lines of railway or transmission lines of the Railway Company subject hereto shall not be broken; (3) the Railway Company shall have sold or exchanged or have contracted to sell or exchange the property so to be released.

Plaintiffs admit that the requirements of the indenture pertaining to release of the real property from the lien were met. Plaintiffs also admit that in each instance the property sales were for a fair and adequate consideration. In addition, the record is clear that the real property disposed of was not producing material revenue, the sales did not interrupt the continuity of the FDM operations, and the property sold was not necessary or advantageous in the business operations. Thus, we conclude that the applicable requirements of the indenture were satisfied.

The record, moreover, reveals that despite plaintiffs' purported alarm over these sales, such sales of real property were not unique to the period of time since C&NW gained control of FDM. More real property was in fact sold off during the years that Snerson and Salzberg and their associates controlled FDM than has been sold during the period of C&NW control. Those sales, too, were ostensibly sales of property which neither produced material revenue nor was needed in operations.

Contrary to plaintiffs' contentions, we are also satisfied that the railroad defendants made proper accounting for the proceeds generated by the real property sales. Trial court found that the method of accounting by defendants was consistent with that traditionally utilized by FDM management, i.e., property retirements were credited to the additions and betterments account. That finding is justified. The method of accounting is also in accord with the terms of the indenture.

Lastly, trial court found the remaining assets of FDM to be sufficient security for the outstanding bonds, and so do we.

### VI

We turn finally to plaintiffs' allegation that defendant trustee performed its role negligently or in bad faith. Trial court stated that plaintiffs failed in meeting their burden to prove this allegation. We not only agree with trial court, we find the allegation to be unfounded.

Briefly, as we understand it, this allegation is based on the proposition that the trustee stood by and permitted the railroad defendants to dispose of property pledged as security under the mortgage. Plaintiffs specifically argue that the trustee was negligent in failing to demand that the terms of the trust be complied with in good faith, and that it failed to exercise diligence in its duty to protect the security underlying the mortgage.

Our resolution of these arguments does not require resort to legal principles or authorities, as it is purely factual. These arguments fail because, as stated earlier in this opinion, the terms of the trust were not breached, and the security underlying the mortgage was not jeopardized. Thus, the premises upon which the arguments are founded were never established.

### VII

Trial court's decree is accordingly in all respects affirmed.

AFFIRMED.